Lisa Norman here on behalf of the appellants Mark Caldwell and Ashley Caldwell. The district court in this case erred by denying the appellant's objection to the sale of the collateral and by confirming the sale of that collateral when the sale prices were so shocking and they were sold for a fraction virtually a tenth of the fair market value price of the collateral and when the bank in this instance artificially deflated the bidding by starting the bids at so low a price. Appellants are requesting a reversal of the order confirming the sales and or a finding that no deficiency exists in this case. The bank can foreclose on the collateral under both the Ship Mortgage Act coupled with the Judicial Sales Act but when they do so they must look at the fair market value of the collateral that they are seeking to sale. In this case the fair market value was determined by the surveys that the bank had in its possession and which the bank admitted during the hearing on the objection to the sale it had in its possession. At that point in time they were not under attack. They were the only appraisals that existed. No other appraisals had been commissioned at all by the bank and in fact the bank's officer admitted that the only other... What are you saying? I mean other than just speculation that if the if the bank had not made a low bid to begin with then the sales would have been nearer which was a hundred thousand dollars or so. The sale would have been nearer $840,000 which was the appraised value of the vessels? Yes exactly because... So you're saying that the difference is $700,000 as to what you were entitled to and what you got? Yes and in addition to the vessels there were also docks and a barge and the collective value of fair market value of the collateral was a little over a half a million on the debt. When the bank opened the bid for the first vessel at only $50,000 that then set the where the bidders were going to jump the jumping off point for them which in this case they said a thousand dollars more will do 51. Okay great sold. It has been established that bidding the full amount of the debt and in this case the bank had asked to bid the full amount of the debt and received an order it will drive up the price in the event that there are other bidders at the sale. Let me ask you, what do you hope to get out of this appeal? In other words the the vessel has been sold to someone who now has title to the vessels. What was the impact of the confirmation sale on the title that they already possessed? The title is vested in the bidders and the easiest course of action for this court would be to find that there is no... So the title is vested and you don't have any hope of getting back the vessels or even raising the price that the buyers paid for the vessels. We have asked for either or. Either overturning the sale. Do you have any basis to get more for the vessels from those who possess the title to the vessel now? Only if the bidding were restarted and the sale were conducted again in a proper format. And how could that occur under the circumstances of this case? In this case the more likely option because the title has already vested would be for a finding of no deficiency. All right now you found no deficiency in the loan to the bank. The bank did not sell the vessels. I mean the bank owned the vessels or at least had a land. That is correct. And they were sold in a marshal sale for $112,000. Nobody alleges fraud or collusion or anything in terms of the sale price. No. But the bank now is going to pay the price for the marshal sale at $112,000 by reducing your deficiency to essentially zero. Is that what you're saying? The deficiency should be zero, absolutely. And even in the absence of fraud or collusion... Why should it be? Why should the bank have to eat your loan or your deficiency, your loan? Because the bank is the one that created this artificial deficiency. There never should have been a deficiency. I get your case. So the case is the bank is liable for the total deficiency that you owe on the loan because it started the bid at $50,000 when it had an appraised value of $800,000. That is correct, Your Honor. But the bank could have bid more and then ended up with the... I don't understand why it was only going to be $1,000 more and there was only going to be one other bidder. That's the part of the story I don't get. The bank could have and should have started the bidding where they asked the court to start, which was they asked and obtained an order from the district court to start the bidding at $454,353. Walking into that sale, everyone in the room understood that, at least from our perspective and from what the bank itself had asked for, that that was the jumping off point, nearly half a million dollars. But why did they have to start the bidding higher? Why can't they just watch it progress and bid more if it's a better value? Well, they have an obligation to obtain the fair market value for the sales. And if they're going to create an artificial... But this is what buyers in the marketplace were willing to pay that day. Why isn't that the fair market value? In this case, had the bank started the bidding where they intended to start it when they walked in the room and what they told the district court they were going to do, which was the $454,000, the bidding would have started from there and the bidders in the room would have had to bid higher than that in order to... Why does where the bidding begins inform or dictate where the bidding ends? Well, it certainly would inform that you wouldn't end any lower than that. It sets the floor of where you're going to begin. And in this case, the floor walking into that room would have been coming out with no deficiency either way. But when the bank artificially created a deficiency by bidding only a tenth of the price, when they knew and had in their possession not only the surveys but additional fair market value evidence that the president of the owner of the vessel had provided to it prior to the sale, to walk in to the sale without any new appraisals and having appraisals in your hand showing you have collateral worth over a million dollars and you start the bidding at only $50,000, what you do is you create an artificial deficiency that ends up shocking the conscience to such an extent that you end up with a case like what you had in Heller or Latvian and where the sale price has to be set aside. But there was a third party bidder. There's no evidence that there was collusion between the bank and the third party here. So in those cases, there was not a third party. Why would it — the whole idea of introducing the third party is because you are getting a fair market value. As the Court said in the Encirco case, bidding the full amount will drive up the price in the event that there are other bidders. And prospective bidders will take that starting bid into account when determining what a minimum successful bid would be. In this case, because the bank started the bidding so low, they created a deficiency that never should have existed. And the bidders naturally would only start bidding from the $50,000 as opposed to from the $454,000. Let me get this clear. You want the confirmation set aside, the confirmation of the sale to the buyers set aside, but you are not contesting the right of the buyers to maintain and keep the vessels because they have title to it. The vessels stay where they are. The rights of the people who purchase it are unimpaired by your argument. And the only person who's going to suffer any kind of damages as a result of your argument is the bank. Is that correct? There are two alternatives, either setting aside the sale or finding that no deficiency exists. And, yes, the bank would be the one that would, in your words, suffer. But in our words, that would be the just outcome, considering that it was the bank that created this situation to begin with. What I'm trying to get is are the buyers out of—in terms of your argument, the buyers are out. They have title to the vessels. They can keep them, irrespective of whether the judge sets aside the sale. Is that what you're saying or not? Yes, Your Honor. That is what you're saying. Okay. They set aside the sale price and do not confirm the sale, but that has no effect on the title that the buyers have. I understand that now. Thank you. Yes, and that this court can enter a finding that there is no deficiency. That's what you—you're not really arguing your other point. Every time Judge Jolly asks you a question about should the whole sale be set aside, which is one of your two remedies that you started off with, you say, well, no, really, what we're asking for is deficiency because it seems harsh to the third party. So are you only arguing for there to be a deficiency? It's our position that this court can do either, but to answer a question that you asked on the prior case, what's the easiest course of action for this court to take? For this court to take, the easiest course would be to find no deficiency based upon the— What case says that we can take the sale away from the third party? None of those cases have to do with third parties. Correct, Your Honor. The closest case that we have is the Heller case and the Lotvien case, in both cases where the sales were set aside. So you say we could do that, but there's no case. I'm saying both of those cases give you the power to do that, but in our situation where you're dealing with a guarantor and an alleged guarantor as the appellants as opposed to the owner of the vessel, you have a different case before you than what Heller and Lotvien envisioned. But in either case, both of those courts found that when the bank knew of the appraised value, the fair market value of the vessels, and chose to bid far below the fair market value or to start the bidding far below the fair market value, the court has the power to set those sales aside. Is it your position that the $454,000 was a binding obligation of the bank at the time it went into the sale for it to bid that amount? No. The order that it obtained from the court was that it could bid up to $454,353 plus interest costs. Up to, which would say that you could bid $1. Absolutely you could not bid $1, Your Honor, because they do have an obligation when they are — when they walk into that sale and they are the opening bid. What gives that obligation? You keep saying they have — they must start the bidding higher to signal to everybody else in the room. What case or law gives them that obligation when there are third-party bidders in the room? The Ship Mortgage Act under 46 U.S.C. 31321 and the Judicial Sale Act, 46 U.S.C. 31325, allows them to sell the collateral but also requires that there not be a significant disparity between the sale price and the value of the collateral, as those two statutes have been interpreted in Heller, Latvian, and in Serco. The bid — the bank's low bids in this case depressed the auction prices and resulted in a gross deficiency. Yet the bank had every financial reason to try to get as much at that bid as they could for those — Absolutely. — for those ships, and you're alleging that they suppressed the value of their own asset. That is correct, Your Honor, and I would — Does that make sense to you? I was standing in that room when that auction took place, and I, myself, frequently am conducting auctions on behalf of the bank and walk in knowing that fair market value is what the bank is going to be starting bidding at. And I, myself, was absolutely shocked when the bank opened the bidding at $50,000 when we had collateral sitting there that was worth almost double what the note value is. You considered it also against the interests of the bank itself for them to bid for $50,000, and that's what astonished you? It astonishes me that they would not bid the fair market value of the vessels and that they would create an artificial deficiency when none existed. When they had in their possession collateral that was worth double what the amount that was owed on the note to start the bidding at such a low amount — Well, is that the easiest explanation? Sometimes the simplest explanation is the right one, that it wasn't actually worth the amount of the 2-year-old or several-year-old appraisals anymore, or else they would have turned around and bid $51,000 and ended up being able to sell it later for much more. Well, actually, in this case, not only did they have the appraisals, they had additional fair market value information that was provided to them by the president of the owner of the vessels. And as that individual, Mr. Caldwell, testified at the hearing, shortly after the sales, one of these bidders turned around and came to him and said, OK, I know I can sell this for eight times what it's worth. Do you want to buy it back from me now? Everyone in that room, when the bank started the bidding at only $50,000, was shocked. But for the bidders, it was a pleasant surprise. If there were multiple bidders, why wasn't there a bidding frenzy at that point, if what you're saying is true? There was only one bidder on one of the vessels, and I believe one on the second one, and then on the third one, there were two individuals that bid. There were a roomful of people that came that observed, mostly within the industry, other individuals that are in that boating industry around the Clear Lake area, who have an interest in what's going on with their competitors. But in terms of active bidders, there were not that many active bidders. Right, but that doesn't comport with you saying the person turned around and said, I can get eight times more right this second. If there are knowledgeable people in the industry all standing around at the auction capable of bidding, then they, too, would sense that great deal and want to try to get in on and get it, unless there's some kind of other secret thing going on. But what you're saying doesn't make sense in the marketplace. Well, in this case, because the bank only started at $50,000, it would make no sense that the bidder would come in and say, okay, I'll do $400,000 straight off the bat. They went up by $1,000, and the next bidding started, and they went up by $1,000. So it was $51,000, $51,000, and then $5,000 was the plaintiff's bid price on the third vessel. Okay. I think we have your argument, and you've saved time for rebuttal, and you've answered our questions. Thank you. Thank you. Hi. Good morning, Judge Elrod, Judge Jolly, Judge Willett. May it please the Court. My name is Paxton Crew. I'm here on behalf of Allegiance Bank, Texas. Your Honors, the district court got this case absolutely right. As the panel is aware, this is an abuse of discretion standard in setting aside Judge Hank's order confirming the sale and also denying the motion to set aside the sale. There were evidentiary hearings in this case, and the appellants, although ably represented by counsel, have come up with a very novel, creative argument, which would, I think, have a very negative effect long term on deficiency actions. Have not taken into consideration the full factor of the evidence that was presented. Why did the bank take such a hit? Why did they take such a hit? Yes, if they could have gotten so much more. Judge, I think that's, I think, a very astute question. The market, as Judge Willett commented, set the price at that auction in that day. That's what the law in this circuit is, that the fair market value, absent any evidence of fraud, collusion, or gross inadequacy of price, is the value of the vessels. It was determined when the gavel fell and the marshals. Well, you'll have to acknowledge, it seems to me, that if they did, in fact, appraise it $800,000 two years earlier and it sold for one-eighth of that two years later, that that is a cause worthy of looking into. Absolutely, Your Honor. And the district court did look into that. The district court not only heard the evidence of the valuation surveys from 2014, but it also considered the affidavit of the very marine surveyor who conducted those surveys. And his affidavit is in the Appley's Record Excerpt. It's the Record on Appeal 394. He disavowed the legitimacy of those valuation surveys for a marine asset that's used in the saltwater that is continually deteriorating. One of the utility of these loans that the bank extended to this dinner cruise operator was for the maintenance and upkeep of these vessels. And that is an issue that was before the court on what had been done, what was the condition of the vessels now. The appellants would very much like to put the burden that they have to show of gross inadequacy of price on the bank by saying that the bank wasn't commercially reasonable by not bidding the full amount of three-year old valuation surveys. But part of the other evidence that was considered apart from Mr. Frenzel's affidavit where he disavowed those surveys was another subsequent survey that the bank had to obtain because it was carrying hull and machinery and protection and indemnity insurance on these vessels while they were in the substitute custodian's possession. So it had to do this for the insurance company. And again, Mr. Frenzel, the marine surveyor, was appointed. And in our record excerpt, he conducted three valuation surveys. And that's in the record at 599, 605, 614, and 620. He indicated that the two most valuable vessels, which appellants indicate are worth well in excess of $400,000, were worth only $60,000 in the very year that they were sold. So I think that this was evidence that the district court heard and weighed, you know, what's the court supposed to do? Is this the best evidence, $60,000 for the price of the Star Cruiser, $60,000 for the price of the Star Gazer, when they each sold for $51,000 at auction, and that's an open public auction? Or is it these three-year-old valuation surveys, which conveniently would leave the debtors with no deficiency? Would the valuation survey on a marine asset last forever? I think that we'd be in a different situation. That's not what – there's no standard that I found in any cases that indicate that that's something that this court or the district court could rely on. We have a market that dictates what the price is. And by the way, appellants have tried to implicate the bank in not acting in a commercially reasonable nature. It bears noting that the debtors to this case had an obligation as well to try to eliminate their deficiency. And one of the unusual aspects about this case is that following the – during the confirmation of sale hearing, they entered an impromptu upset bid, which exceeded the value of the vessels. But they didn't bid anywhere near what the valuation surveys were. They entered an impromptu upset bid of $200,000. And this was, again, without deference to, you know, this circuit's rules on in-rim versus in-personam proceedings. One of the issues that we've raised is whether or not this court even has standing to render an opinion on the deficiency judgment at this stage. And that's primarily because the sale of these marine assets, these in-rim assets, no one appeared. Have you made a demand for deficiency yet? We have not, Your Honor. It's not been set because obviously this has been clouded because of this appeal and the finality of the vessel sales. As the court is aware, the Ship Mortgage Act requires first that there be a – that sale was confirmed and then whatever the remaining amount owed on the deficiency is then – What would have been the effect if the judge had set aside the price – set aside the sale while the third-party buyers had title to the vessels? What would have been the consequences of that? Your Honor, that is a very interesting question on what would happen to the vessels. I think that the district court probably did not have jurisdiction after title had passed. But so long as the U.S. Marshals still had custody as agents of the court, the district court could have set aside the sale, continued to hold those assets, ordered another auction to be conducted, ordered its own special master to conduct valuation surveys on the vessels to get to the bottom of this. The district court could have done a number of things. Did plaintiffs ever ask that a new sale be conducted? They have not, Your Honor. Counsel, can you help me a little bit with the chronology? The joint order that was brought in for the district court to sign, was that while the marshals – I mean, while they were still holding custody of the vessel, was that – could the court have effectuated that joint order? And that joint order is very perplexing to me. Yes, Your Honor. I understand. It's an unusual aspect to what typically should have been a simple marine asset sale and foreclosure. The chronology was the vessels were arrested by the U.S. Marshals Service. They were held in custody with the substitute custodian. The bank published notice of the arrest in the Galveston Daily News. An auction was later held. And importantly, the appellants in this case were given notice of that arrest. And the notice required them to come forward. I see I'm almost out of time. I'm going to try to get through this as quickly as I can. They were given notice of the arrest, but they did not file a claim of order of ownership, which would allow them to come in and contest the interlocutory sale. So what happened is, as Ms. Norman mentioned, she was at the auction as well as the appellants. They waited until after the gavel fell. They waited until the hearing to confirm the sale or their late motion to set aside the sale and offered more money as an upset bid from what the successful bidders made. And so then the bank was willing to go and get that extra $100,000 or whatever it was. Absolutely, Your Honor. The bank was acting in its best interest to its shareholders to try to recoup as much money as it could. When it was presented with an offer more than it received at judicial auction, it took it. But the important part about that is it was up to the court whether or not to confirm that upset bid and set aside the previous one. So I think to answer your question, the issue on whether the district court could have set aside the sale at that point, yes. But it did not. But it was within his discretion? Yes, Your Honor. And one other important part of that was is that the motion to set aside the sale was filed by the appellants in this case. The interested buyers, who Mr. Soto represents and he'll go next, were not given notice of that motion to set aside the sale. And that also— So they may have come in after. So it would have cleaned up the issues between you all, but they may have come in with some issues against all of you. That's correct. But the district court did ultimately address that and resolve it before the sale order for the sale was confirmed. I see that I'm out of time. If the panel doesn't have any more questions, I thank you for your time this morning. Thank you. Thank you very much. Mr. Soto? Thank you. May it please the Court, my name is Andres Soto. Given their concession that you can keep the vessel and that they want nothing out of you, why do you need to argue? Well, Your Honor, I don't know that I do. And the issue, the reason I'm here today is because that's not a concession that has been clear throughout this proceeding. Even today, I think counsel, although she admitted that they're not asking for the vessel's back, walk that back a little bit when she's talking about her two alternative forms of relief. She still claims that the Court has the power to re-seize those vessels, and I'm here to argue to the Court that that's simply not true, that because the appellants were unsuccessful in obtaining a stay of the order confirming the sale of the vessels, because they did not obtain a stay before the U.S. Marshals issued bills of sale, those vessels have now been transferred free and clear of all liens, encumbrances, and prior interests. So neither the appellants nor Appalachian Allegiance Bank have an interest in those vessels any longer. I think this Court's decisions in Community Bank, in Eurasia, in Dynamic, which are cited in our brief, make it very clear that there is no statute, there is no legal basis to go back and re-seize those vessels. And further, because there is not an in personam claim against the new vessel owners, Appalese, Bristol, and Holler, there's no basis to issue a judgment that would effectively amount to an in personam claim against them. So I do not believe that this Court has the— So, okay, so, I mean, you wanted to argue it. I'll ask you some questions. And that is that if we should reverse the district court and say you made a mistake in confirming this sale because it is grossly inadequate and we want you to set aside the sale, where would you be then? Your Honor, I do not believe that a judgment— If that happened, where would you be? I think we'd be in the same position, Your Honor, because the vessels cannot be re-seized. There cannot be a subsequent sale of this vessel. So essentially what would issue would be a useless judgment under the Community Bank case because you'd have a judgment setting aside the sale, but this Court cannot re-seize those vessels. There cannot be a subsequent sale. So effectively no relief is being— Do you still have the vessels? Yes, Your Honor. You have not sold them yourself? Not to my knowledge, Your Honor. Well, we were told, I thought, by your co-counsel that it was conceivable for the district court to set aside the sale and to order a new sale if it had not confirmed the sale. Because what is the point? You asked for the confirmation, right? You're the part that asked for the confirmation. Correct, Your Honor. Okay, and the court comes in, just say denies it. So you're saying that you asked for something that was totally unnecessary and that if you had not won, it would have damaged your position? Until the court confirmed the sale and until the U.S. Marshals issued a bill of sale, the court, under the supplemental maritime rules, could have ordered a new sale. I guess we can now because that's on appeal to us. I mean, it hadn't been final if it's on appeal to us. Had the appellants obtained a stay of that order and prevented the bills of sale from issuing, then that could have happened, Your Honor, but because they did not, the order was entered, the bills of sale were issued, the court, this was an in-rem claim against the vessels. Those vessels are no longer in the court's possession. They're in the possession of the appellees, and they're simply no longer. Why did you ask for a confirmation of the sale? We asked for a confirmation of the sale prior to the sale being confirmed. When we asked for a confirmation of the sale— Yes, you did. I mean, you asked for confirmation. You wouldn't have asked for confirmation if it had been confirmed. So you asked for a confirmation, which is confirm the sale. I'm asking you why did you ask that given your argument now? When we asked for it, the sale hadn't been confirmed, so we had to ask for confirmation in light of the objection. What if the district court had said, I do not confirm it? Had the district court not confirmed the sale, the district court could have ordered a new sale because possession would not have transferred yet, and the appellant's interest in the vessels and the appellee's interest in the vessels would not have been extinguished. So they should have gotten a stay or something? Correct, Your Honor. They did not get a stay timely before the transfer took place. Correct, Your Honor. And so the important thing to note is that by failing to get that stay and because that order issued and the U.S. Marshals Bill of Sale issued, their respective interests in the vessels have been extinguished. And you didn't, like, do this in the middle of the night or something. Everybody knew this was happening and going down and this was done in court and everything, and they could have sought a stay. Absolutely, Your Honor. In fact, it was the opposite. The purchasers were unaware of the objection to the sale until after the fact, until after this agreement, which is called a protest bid, which was really a settlement agreement. Right, and you weren't party. They didn't invite you to court that day. No, Your Honor. We found out after the fact. My clients were underrepresented. When we found out, they found lawyers and we appeared and we moved to confirm the sale. And I would like to address, though, this issue of the protest bid as evidence of fair market value. This is not a protest bid. A protest bid— Why do you want to address this? How does this affect you? Well, to the extent that the court is going to get into this issue of fair market value of the vessels, which I don't believe is necessary, frankly, because, as I said, I don't believe these vessels can be taken away. But it's— All of what we're going to hear in the next three minutes and 50 seconds is unnecessary? I believe that the court has the authority to readjust this deficiency. Candidly, Your Honors, that's not an issue that the Apple East Bristol & Hall are all that interested in. All we want to make sure is that the court is aware that there is no legal authority to retake those vessels back from the Apple East. I think you made that point, counsel. Okay. Well, if there are no further questions, then I'll attend the remainder of my time back to the court. Okay. Thank you. Thank you, Your Honors. I didn't say we agreed with you. I just said you made the point. With regard to the stay, appellants requested a stay both of the district court and also requested a stay of this court. The request for the stay was denied. On the issue of the joint order, Judge Elrod, you had some questions about that. At the hearing on the objection to the sale, a protest bid was made. Now, they say—somebody said he was going to tell us why this wasn't technically a protest bid. Was it a technically—technical protest bid? It was, and that issue was raised as well with the district court about whether it was technically a protest bid, and the court did accept it as a protest bid. Why didn't you invite the putative buyer if you were going to do this? Well, we filed the— They could file their objections. Why were you having this hearing without them? Didn't they have an interest in the matter? We filed the objection to the sale with the court. The idea of the protest bid was not anything that was contemplated in advance at all. It was just setting aside the sale. But they did ask that they be considered as well and they be allowed time to object. All the parties agreed that they should be allowed to put their response to the objection to the sale on the record. We then had a subsequent hearing. After they filed their response, the bidders filed their response with regard to the objection to the sale and entry of the protest bid. It was after that that the bank and the appellants entered into the joint order and filed a motion in the district court together, the bank and the appellants, asking the court jointly to set aside the sale to these bidders and to confirm the protest bid. Remind me, when you sought the sale, I mean the stay in the court of appeals, had the vessels already been transferred at that time?  And that is why we believe that the court did abuse its discretion. There were a number of issues specifically with regard to the adequacy of the sale price that needed to be fully considered before the vessels were released. And as pointed out, there are three factors that this court looks at in determining whether they're going to set aside a sale or find that there's no deficiency. But if you denied it, then the court could have gone about its business. Yes, and that's part of the reason why we're here, because we believe that the court abused its discretion in denying it. While we're not looking at fraud or collusion, we are looking at the third factor that this court has considered and has found as grounds for setting aside the sale or finding no deficiency, and that is gross inadequacy of price. That is the ground upon which we've moved for the sale to be set aside or for entry of no deficiency to be found by the court. And you say that gross inadequacy is the result of the artificially low opening bid. That is correct. The artificial deficiency that was created by the bank's opening bid, the depressed opening bid. If the bank had offered an opening bid of, what was it, 50? They did. They opened with $50,000 on the Stargazer. If the bank's opening—again, I just really struggle with how consequential, how determinative the opening bid is to where everything lands when all the dust settles. Well, the court in Encirco considered that very question about where you start and where you land and found that the prospective purchasers look at where you start to determine where you land and that bidding the full amount of the deficiency debt would drive up the price in the event that there are other bidders there. And you said it was $50,000 for the Stargazer. That's correct. There were three vessels involved. There were—yes. So the $112,000 that it ultimately sold for included three vessels. The initial bid included one vessel. They ended up doing three separate sales, and this was something that was discussed prior to—immediately before the sale began. $50,000 is not necessarily low compared to what the three of them ultimately sold for. Is that—I don't know about that. The $50,000 opening bid for the Gazer was low because the fair market value evidence that the bank had in its possession at the time of the sale, which is the point that we look at at the time of the sale, was $600,000 for the fair market value of that vessel. There then was a second sale with regard to the Cruiser, and the bank opened the bid at $50,000 while they had evidence in their possession that the appraised market value of the Starcruiser was $200,000. In other words, the $112,000 that the fair market buyers bid for included about $50,000 for the vessel Stargazer in which it opened for because you've got two other vessels in there that ultimately jacked it up to $112,000. It's not like it went from $50,000 to $112,000 on all three vessels. No, it went from $50,000 to $51,000, and then that sale was over and a new one started. At $51,000, did it include the other two vessels? No. Then a second sale started that started at $50,000, and they bid it up to $51,000. But the total you got for three vessels was $112,000. That's correct. Okay. After three separate sales. Go ahead. It's your time. I am out of time. Thank you very much for your consideration. I have a question. Oh, yes. If it was so crucial to get a certain opening bid, then why didn't you ask the district court to not say up to that amount but to say between this amount and that amount? Why did you not object to the order that allowed for this? The order itself is what allowed for this, and I don't think there was a timely objection to the form of that order. No, Your Honor, and in fact, we weren't the vessel owner, and so the motion itself with regard to the default judgment was against the vessel owner. We were representing the guarantors in that situation. Thank you very much for your time. Do you want to take a break now? And I'm going to put you away.